Alan Himmelfarb
KAMBEREDELSON LLC
2757 Leonis Blvd.
Los Angeles, CA 90058
(323) 585-8696
ahimmelfarb@kamberedelson.com

Jay Edelson
Ethan Preston
KAMBEREDELSON LLC
53 West Jackson Ave., Suite 1530
Chicago, IL 60604
312-589-6370
jedelson@kamberedelson.com
epreston@kamberedelson.com

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| | |
|---|---|
| JOHN LOFTON, an individual, on his own behalf and on behalf of all others similarly situated,<br><br>Plaintiff<br><br>v.<br><br>BANK OF AMERICA CORPORATION, FIA CARD SERVICES, N.A., a national banking association, CARLSON COMPANIES, INC., a Minnesota corporation, CARLSON TRAVEL NETWORK ASSOCIATES, INC., a Minnesota corporation, and CARLSON TRAVEL GROUP, INC. a California corporation, and DOES 1 to 100,<br><br>Defendants. | No. 07-05892 (EDL)<br><br>Judge Elizabeth D. Laporte<br><br>**DECLARATION OF ETHAN PRESTON IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND CONDITIONAL CLASS CERTIFICATION**<br><br>Date: January 15, 2008<br>Time: 9:00 a.m.<br>Location: Courtroom E, 15th Floor<br>450 Golden Gate Ave.<br>San Francisco, CA 94102 |

Pursuant to 28 U.S.C.§ 1746, I, Ethan Preston, hereby declare and state as follows:

1.     I am over the age of eighteen and am fully competent to make this declaration. I make this declaration based upon personal knowledge.

2.     On October 25, 2007, I obtained an itinerary and price for Continental Airline flights 416 and 2629 on December 14 and Continental Airline flights 2143 and 378 on December 16 (the "Tickets") using the Continental Airlines website at http://www.continental.com. The Continental Airlines website provided the itinerary and price for the Tickets through a webpage. A true and correct copy of this webpage is attached as Exhibit 1. Exhibit 1 indicates that the Tickets were available for a total (including all fees and taxes) of $462.10. My understanding and belief is that the Tickets were available to the general public at the price of $462.10 through the Continental Airlines website.

3.     A true and correct copy of the WorldPoints *Program Details* is attached as Exhibit 2. *See* FIA Card Services, *Program Details*, Travel Rewards, *at* https://wwwa.managerewardsonline.com/RMSapp/Ctl/link?eid=F61D305B (2007). Exhibit 1 states, *inter alia*, that

> 11. Independent third parties manage the Merchandise and Gift Card/Certificate Rewards portions of the Program. An independent third party travel agency, registered to do business in California (Reg. No. 2036509-50); Ohio (Reg. No. 87890286); Washington (6011237430) and other states, as required, manages the Travel portion of the Program. The Cash Rewards portion of the Program is managed by FIA Card Services, N.A. The MyConcierge Rewards portion of the Program is managed by Les Concierges, Inc.
>
> . . .
> Travel Rewards
>
> . . .
> The number of Points and corresponding MDV required for coach class Basic Air Rewards are: within the 48 continental states of the U.S.: 25,000/$400; from the 48 states to Canada, Mexico, Puerto Rico: 35,000/$600; from the 48 states to Alaska, Hawaii, the Bahamas, Bermuda or the Caribbean; 45,000/$600; from the 48 states to Europe: 60,000/$800; and from the 48 states to Central or South America, Asia, Africa, or the South Pacific: 85,000/$1,150. The number of Points and corresponding MDV required for first- or business-class Air Rewards from the 48 states to any location listed above, are: 100,000/$1,500; 135,000/$2,000; 200,000/$3,000; 265,000/$4,000; 335,000/$5,000: References to the 48 states include travel to and from the District of Columbia. MDV includes all taxes and destination fees except the September 11th Security Fee and

surcharges, including, but not limited to fuel related surcharges and/or additional security fees deemed necessary by the individual carrier. Round-trip ticketing must be made through the WorldPoints redemption center on the same U.S. carrier, approved by the Airline Reporting Corporation. Unless redeeming Points for first- or business-class travel, the ticket will be coach class and the lowest fare available through the travel provider at the time of booking.

(Ex. 2.)

4.    On or about November 12, 2007, I called (208) 429-5332, which played the following automated voice recording:

"Travel Plans and Trip Charges are names that may appear on your statement if you have used your credit card for travel reservations or for changes to travel reservations using credit card redemption points. If you have made or changed reservations within the last several months, please refer to the itinerary you received for an explanation of these charges. If you have any further questions, please visit our website, www.tripcharges.com, or continue to hold for our next available representative."

5.    A true and correct copy of the webpage at http://www.tripcharges.com is attached as Exhibit 3. Exhibit 3 contains the following copyright notice at the bottom of the webpage: "© 2007 Carlson Travel Group, Inc. and Subsidiaries."

6.    On December 4, 2007, I performed a "whois" query on the domain name "tripcharges.com." The query returned, in relevant part, the following information:

Registrant:
    Carlson Companies, Inc
    (DOM-1522271)
    1405 Xenium Lane Plymouth
    MN
    55459 US

Domain Name: tripcharges.com

    Registrar Name: Markmonitor.com
    Registrar Whois: whois.markmonitor.com
    Registrar Homepage: http://www.markmonitor.com

Administrative Contact:
    Carlson Companies, Inc
    (NIC-14210714)
    Carlson Companies, Inc
    1405 Xenium Lane Plymouth
    MN
    55459 US
    hostmaster@carlson.com +1.7632124000 Fax- +1.1111111111
Technical Contact, Zone Contact:

1

2

3

4

       Carlson Companies, Inc
       (NIC-14210714)
       Carlson Companies, Inc
       1405 Xenium Lane Plymouth
       MN
       55459 US
       hostmaster@carlson.com +1.7632124000 Fax- +1.1111111111

7.     On or about December 4, 2007, I searched the website maintained by the Office of the California Attorney General at http://vcinweb.doj.ca.gov/SellerOfTravel/SotprodTest/sotInput.asp for the registration number 2036509. A true and correct copy of the webpage returned on that search is attached as Exhibit 4. Exhibit 4 indicates that Carlson Travel Group, Inc. is registered as a California Seller of Travel under the registration number 2036509.

8.     The attorneys at KAMBEREDELSON LLC responsible for prosecuting this case are well qualified and highly experienced in litigating consumer fraud actions. A true and accurate copy of KAMBEREDELSON LLC's biography is attached to this Declaration as Exhibit 5.

9.     I declare under penalty of perjury, that the foregoing is true and correct.

Pursuant to Section X of the Northern District of California's General Order No. 45 on electronic case filing and 28 U.S.C.§ 1746, in lieu of Ethan Preston's signature on this declaration, Alan Himmelfarb attests that Ethan Preston is the signatory of this declaration, and that Ethan Preston concurred to this declaration on December 5, 2007.

DATE: December 5, 2007

                                s/Alan Himmelfarb
                                ALAN HIMMELFARB

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 1

Continental Airlines - Review Ticket Details       file:///home/pn/Desktop/WorldPoints/MotionForPI/Contin...

Case 3:07-cv-05892-SI     Document 3-3     Filed 12/06/2007     Page 6 of 32

Continental Airlines  SkyTeam
United States - English Change
Sign In | My Account | Contact Us | Help     Type in keyword    Search

- Home
- Reservations
    - Make Flight Reservation
    - Make Hotel Reservation
    - Make Car Reservation
    - Change/View Existing Reservations
    - Check-in for Flight
    - Vacation Packages
    - Make Cruise Reservation
    - Make Activity Reservation
    - Refund Policy
    - Using continental.com
- Travel Information
    - Flight Status
    - Timetable
    - Baggage Information
    - Traveling with Animals
    - Special Travel Needs
    - Airport Information
    - During the Flight
    - Route Maps
    - Destination Information
    - Wireless Tools
- Deals & Offers
    - continental.com Specials
    - E-mail Subscriptions
    - OnePass News & Offers
    - Promotional Certificates
    - Special Offers
    - Vacation Packages
    - Veteran's Advantage Discount
- OnePass Frequent Flyer
    - Enroll in OnePass
    - OnePass Overview
    - OnePass News & Offers
    - OnePass Program Rules
    - Elite Status
    - Earn Miles
    - Use Miles
    - Transfer Points into Miles
    - Make Reward Reservation
    - My Account
- Products & Services
    - Business Products
    - Continental Airlines Credit Card
    - EliteAccess Travel Services
    - Gift Certificates
    - Gift Registry
    - Presidents Club Lounges
    - Travel Club
    - Travel for Groups & Meetings
    - Travel for Military & Government Personnel
    - Travel Products
    - Trip Insurance
- About Continental

Continental Airlines - Review Ticket Details           file:///home/pn/Desktop/WorldPoints/MotionForPI/Contin...

Case 3:07-cv-05892-SI    Document 3-3    Filed 12/06/2007    Page 7 of 32

- Advertising
- Career Opportunities
- Company History
- Company Profile
- Company Store
- Global Alliances
- Investor Relations
- News Releases

Search FlightsChoose FlightsTicket DetailsTraveler DetailsComplete PurchaseConfirmation

# Review Ticket Details

Price Details:

| | | |
|---|---|---|
| 1 Adults (age 18 to 64) | $434.00 | No payments for 90 days when you pay with Bill Me Later. |
| Additional Taxes/Fees | $28.10 | |
| **Total Price** | **$462.10** | |

Flight Details:

| Depart: | Arrive: | Flight Time: | OnePass Miles/ | Flight: |
|---|---|---|---|---|
| 6:00 a.m. | 11:46 a.m. | 3 hr | Elite | **CO416** |
| **Fri., Dec. 14, 2007** | **Fri., Dec. 14, 2007** | 46 mn | Qualification: | Aircraft: |
| San Francisco, CA (SFO) | Houston, TX (IAH - Intercontinental) | | 1,635 /100% | **Boeing 737-300** |
| | | | | Fare Class: **Economy (V)** |
| | | | | Meal: **Snack No Special Meal Offered.** |

**Change Planes.** Connect time in Houston, TX (IAH - Intercontinental) is 59 minutes.

| Depart: | Arrive: | Flight Time: | OnePass Miles/ | Flight: |
|---|---|---|---|---|
| 12:45 p.m. | 3:54 p.m. | 2 hr 9 | Elite | **CO2629** |
| **Fri., Dec. 14, 2007** | **Fri., Dec. 14, 2007** | mn | Qualification: | Aircraft: |
| Houston, TX (IAH - Intercontinental) | Greenville/Spartanburg, SC (GSP) | | 838 /100% | **Embraer RJ145** |
| | | Travel Time: **6 hr 54 mn** | Total Miles: 2,473 | Fare Class: **Economy (V)** |
| | | | | Meal: **Snack** |

Continental Airlines - Review Ticket Details       file:///home/pn/Desktop/WorldPoints/MotionForPI/Contin...

Case 3:07-cv-05892-SI     Document 3-3     Filed 12/06/2007     Page 8 of 32

**No Special Meal Offered.**

Continental flight 2629 operated by ExpressJet Airlines, Inc. dba Continental Express.

| Depart: | Arrive: | Flight | OnePass | Flight: |
|---|---|---|---|---|
| 6:35 a.m. | 8:08 a.m. | Time: | Miles/ | **CO2143** |
| **Sun., Dec. 16, 2007** | **Sun., Dec. 16, 2007** | 2 hr | Elite | Aircraft: |
| Greenville/Spartanburg, SC (GSP) | Houston, TX (IAH - Intercontinental) | 33 mn | Qualification: 838 /100% | **Embraer RJ145** Fare Class: **Economy (V)** Meal: **Snack No Special Meal Offered.** |

**Change Planes.** Connect time in Houston, TX (IAH - Intercontinental) is 1 hour 2 minutes.

| Depart: | Arrive: | Flight | OnePass | Flight: |
|---|---|---|---|---|
| 9:10 a.m. | 11:26 a.m. | Time: | Miles/ | **CO378** |
| **Sun., Dec. 16, 2007** | **Sun., Dec. 16, 2007** | 4 hr | Elite | Aircraft: |
| Houston, TX (IAH - Intercontinental) | San Francisco, CA (SFO) | 16 mn | Qualification: 1,635 /100% | **Boeing 737-800** Fare |
| | | Travel Time: **7 hr 51 mn** | Total Miles: 2,473 | Class: **Economy (V)** Meal: **Snack No Special Meal Offered.** |

Continental flight 2143 operated by ExpressJet Airlines, Inc. dba Continental Express.

> [Change Flights](#) or [Start New Search](#)

Rules and Restrictions:

- **This ticket is non-refundable. If you cancel your reservation prior to scheduled departure, you may, subject to applicable [rules](#), change the ticket for travel up to one year after the ticket was originally issued; otherwise the ticket has no value.**
- Read the [penalty rules](#) for changes and cancellations associated with this fare.
- Read the complete [rules and restrictions](#) applicable for this fare.

Continental Airlines - Review Ticket Details      file:///home/pn/Desktop/WorldPoints/MotionForPI/Contin...

Case 3:07-cv-05892-SI     Document 3-3     Filed 12/06/2007     Page 9 of 32

- Read the Electronic Travel Certificate terms and conditions (if applicable).
- Non-Elite OnePass members traveling on Y, H, K, N, or B (or equivalent) fares are eligible for mileage-deduct upgrades within or between the 48 contiguous U.S., Alaska and Canada.
- The free baggage allowance is two checked bags not to exceed 50 lbs (22.7 kg) [70 lbs (32 kg) for OnePass Elite customers] and 62 linear inches (157 cm) (total length + width + height) per piece. Review our complete checked baggage policy
- Review our complete baggage policy

☐ **I accept the fare rules associated with this non-refundable ticket. Any changes made to this ticket will result in additional fees.**

**OnePass Members**

To continue the booking process using your saved preferences, please sign in to your account now. See benefits of signing in to your account.

OnePass Number or Username:

PIN or Password:
Don't know your PIN? Please see Forgot Your PIN.

☐ Remember Me

Security Info

[ Sign In & Continue ]

[ Back ]

**Continue without Signing In**

Click continue below to proceed with the booking process.

You'll have the opportunity to enroll in our frequent flyer program at the end of the booking process if you wish.

**If you are a OnePass member** and do not wish to sign in to your account, you can enter your OnePass number on the next page for mileage credit.

[ Continue ]

[ Back ]

Note: OnePass frequent flyer mileage information is provided as a convenience to OnePass members. Elite miles is the percentage of OnePass miles earned towards Elite status when booked on continental.com. Actual flown miles will be posted to your account. Fare class, Elite and other promotional bonuses are not included in the totals listed. A minimum of 500 OnePass miles is earned for flights less than 500 miles in distance. For Amtrak train segments 250 OnePass miles is awarded for Economy Class and 325 OnePass miles for First Class.

BBBOnline Privacy Seal
Business Services | Cargo | Careers
Contract of Carriage | Customer First | Legal Information | Privacy Policy | Site Map |
Travel Agents

Continental Airlines - Review Ticket Details          file:///home/pn/Desktop/WorldPoints/MotionForPI/Contin...

Case 3:07-cv-05892-SI      Document 3-3      Filed 12/06/2007      Page 10 of 32

Copyright © 2007 Continental Airlines, Inc.
All rights reserved.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 2





Site Map · Help · **Sign In**

Home        Features        Rewards Center        MyConcierge<sup>SM</sup>        Ultimate Access

---

**Benefits**

**Program Details**

**Contact Information**

---

**Bonus Points**

**Merchandise**

**Gift Cards**

**Cash**

**Travel**

---

**Features**

**Benefits**

**Program Details**

**Contact Information**

---

**Apply for WorldPoints<sup>TM</sup>**

Apply Now

---

**WorldPoints Quicklinks**

Merchandise Catalog

MyConcierge

Earn Points

---

**Bank of America Quicklinks**

bankofamerica.com

Online Banking

Balance Transfer

---

## Program Details

### WorldPoints<sup>TM</sup> Rewards Program Rules

WorldPoints<sup>TM</sup> Rewards credit card customers are automatically enrolled in the WorldPoints<sup>TM</sup> Rewards program ("the program") at no additional cost. FIA Card Services, N.A. (also referred to as "our," "us," or "we") sponsors the Program. Independent third parties manage the travel, merchandise, and gift card/certificate rewards portions of the Program. FIA Card Services, N.A. manages the cash rewards portion of the Program. Les Concierges, Inc. ("Les Concierges") manages the MyConcierge personal concierge service ("MyConcierge").

Each cardholder, joint cardholder, and authorized user(s), if any, (referred to as "Cardholder(s)," "Participant(s)," "you," or "your" with a WorldPoints credit card account ("Card"), may earn and use WorldPoints points ("Point(s)" or "WorldPoints"): to obtain car rental and hotel rewards in the United States; U.S. and worldwide air travel rewards; cruise related rewards; a variety of specially selected travel rewards; merchandise, gift card or gift certificate rewards, or cash rewards (collectively, "Rewards"); as full payment for goods or services available through us, the WorldPoints Redemption center, or the MyConcierge service.

A complete selection of Rewards is displayed online at www.bankofamerica.com (the "Site") and, upon request we will mail a printed pamphlet with an abridged selection of merchandise Rewards. Cash Reward checks are obtained through FIA Card Services, N.A. Travel, Merchandise, and Gift Card/Certificate Rewards are obtained through independent third parties. Rewards obtained through the MyConcierge service are fulfilled by third-party suppliers.

Review and keep this document ("Program Rules"). The Program Rules are separate from the terms of your Credit Card Agreement: however, any Claim arising from participation in the Program is subject to the Arbitration provisions of the Credit Card Agreement. From time to time we may change the Program Rules. When any change is made, we will post revisions at the Site and/or we will notify you in writing, as

---

**How far will your points take you?**

**5,000** = $25 check

**12,000** = $100 Gift Card

**25,000** = Fly anywhere in the continental 48 states

---

**Help**

What are net retail purchases?

Is there a limit to the number of points I can earn?

View all Q&A

---

applicable. It is your responsibility to review the Program Rules to be aware of any changes.

General Terms

1. To participate in the program, you must (a) maintain a Card that is open and has charging privileges, and (b) be an individual (no corporations, partnerships, or other entities).

2. Point earnings are based on the new net retail purchase transaction volume (i.e., purchase less credits, returns, and adjustments) charged to the Card during each periodic billing cycle ("Billing Cycle") by the Participant(s) ("Net Purchase(s)"). Earn 1 Point per each Net Purchase dollar. Points are calculated at each transaction, rounded to the nearest whole Point, and are subject to verification.

Cash advances of any kind, including: Automated Teller Machine (ATM) and Bank teller withdraws, balance transfers, direct deposit cash advance transactions, and credit card cash advance checks; the purchase of money orders, person-to-person money transfers, wire transfers, bets, lottery tickets and casino gaming chips; insurance; debt cancellation charges; and any fees or similar charges will not earn Points. Online payments made through Bill Pay Choice[SM] are ineligible for Point earnings. Unauthorized transactions, including those made with a lost, stolen, canceled or fraudulent Card do not earn Points. From time to time, special promotions may feature Bonus Points. Details will accompany the offer.

3. For new customers, accrual of Points may begin on your Enrollment Date. Enrollment Date means the date we mail the Card and the Credit Card Agreement to you. If you are an existing credit card customer and your account is converted to the Program, you may not earn Points until the first day of the Billing Cycle beginning after you receive the Card(s). Points expire five (5) years from the end of the Billing Cycle during which the Points were earned.

4. The Billing Cycle statement will show your Points earnings. Points are not eligible for use until they have appeared on a Statement. With the exception of their use in connection with obtaining the specific Cash Rewards described above, Points have no intrinsic cash value, are non-negotiable, and cannot be redeemed for any benefit except those Rewards designated by us. Points are not property of any Cardholder or other person, and may not be brokered; bartered; attached; pledged; gifted; sold; or transferred to anyone else under any circumstances, including, but not limited to: disability; death; upon operation of law, or in connection with any domestic relations dispute and/or legal proceeding. We shall have no liability for disagreements between Cardholders regarding Points. Points cannot be used to pay off or pay down any credit card accounts issued by us. Discrepancies about Point earnings are not treated as credit card billing disputes: refer to your Statement for details about billing disputes. Our decisions regarding Point discrepancies shall be final. Unless specifically authorized by us, Points and Rewards may not be combined with other discounts, special rates, promotions, or other reward programs offered by us. Unless specifically authorized by us, Points cannot be transferred between any credit card accounts issued by us. For Points transfer eligibility, please visit **www.bankofamerica.com** or contact us. A fee may apply. Points and Rewards may not be combined with any other entity, including

airline frequent flier, hotel frequent guest or other travel-related or membership reward charge or credit card programs, whether in the U.S. or abroad.

Effective 10/23/06; by calling the WorldPoints Redemption Center, you may purchase extra Points in 1,000-Point increments. You may purchase up to a maximum of 10,000 Points per billing cycle. A fee may apply. Any extra Points purchased are subject to all terms and conditions of the Rules, including those concerning Point expiration.

5. To obtain Travel Rewards, Merchandise, Gift Card/Certificate Rewards, go to the Site or call the WorldPoints Redemption Center at 1.800.434.8313. To obtain Cash Rewards, please go the Site or call 1.800.421.2110. To redeem Points for Rewards available through the MyConcierge service, or to make requests through the MyConcierge service without redeeming Points, go to the Site or call the MyConcierge service at 1-800.435.7291. Redeemed Points are deducted from your Points balance as of the date you request a Reward. Requests to redeem or convert Points may be made by the Cardholder and the authorized user(s), if any. Decisions made by us regarding Points redemption shall be final. Neither FIA Card Services, N.A., nor any of the independent third parties shall have any liability for fulfilling Reward requests in good faith in response to any person claiming authority on your behalf. You may designate anyone as the user of a Travel Reward, but all travel documents will be sent to your billing address. Merchandise Rewards (including Gift Cards/Certificates) can be shipped to any address you designate, subject to the shipping terms found at the Site or by calling the WorldPoints Redemption Center. For specific information about the fulfillment of Cash Rewards or the conversion of Points, see the section of the Program Rules discussing this category of reward. MyConcierge Rewards may be issued to anyone you choose, subject to the terms contained in the MyConcierge Terms of Use.

6. Points redeemed for a Merchandise Reward may be credited back to your earnings if the Reward is returned in a timely fashion and in accordance with the procedures we specify. Travel Rewards, Gift Card/Certificate Rewards, and MyConcierge Rewards are considered fully redeemed once issued. No refunds, credits, or substitutions will be issued if improper proof of citizenship or naturalization result in denied boarding or entry when using a Travel or MyConcierge Reward. Cash Rewards are fully redeemed once a check has been issued and mailed to you. We shall not be responsible for lost, stolen, or undelivered checks and substitute checks will be made available. Once a Reward is issued and the value of any transaction(s) forming part of any or all of the Points used to obtain the Reward is either refunded, credited, or otherwise rescinded, we may, at our discretion, cancel reservations, void travel documents, interrupt the shipment of merchandise, stop payment on any check(s), and/or withhold subsequent Points, or collect any amount(s) you owe, in any appropriate manner, including, but not limited to, the posting of an equivalent dollar debit in the form of a cash advance transaction to your Card.

7. If a Cardholder voluntarily closes the Card or we close the Card, all unused Points are immediately and irrevocably forfeited. We reserve the right to disqualify anyone from participation in the Program, refuse to award or redeem Points, and close your Card if, in our sole judgment, you or any other person(s) using the Card, have violated

any of the Program Rules, including but not limited to acts of fraud or other abuse. You are responsible for all transactions and other activities resulting from the use of your WorldPoints credit card account. You must immediately notify us of any actual or suspected unauthorized use of your account.

8. We may, at any time, without prior notice, (a) change, limit, or terminate any aspect of the Program; (b) terminate the Card Program in its entirety; (c) amend the Program Rules, benefits or features, in whole or in part; (d) may discontinue or replace any Reward with a similar one of lesser, equal, or greater value; (e) may modify, delete or terminate any or all of the Program, the Program Rules or any portion thereof, any or all of the participating partners (if any), Rewards, benefits, or special offers if applicable; or (f) terminate a Cardholder's participation in the Card Program for any reason. Changes may affect outstanding transactions and Points, and may include, but are not limited to, the earnings rate for Points, the number of Points required to redeem Rewards, the number of Points required for any Reward, the type of transactions qualifying for Points, the type or value of Rewards, the expiration date of Points and the maximum number of Points that may be earned per month or year, or otherwise, if applicable. Any of the foregoing actions may be taken even if such actions affect the value of Points already earned. The program is not scheduled to end on a predetermined date.

9. We are not responsible for delayed or lost correspondence sent by U.S. mail or any other form of delivery, including e-mail. We assume no responsibility for any error, omission, interruption, deletion, defect, delay in operation or transmission, theft, destruction, or unauthorized access to, or alteration of Points accrued and redeemed or other Program activities. For information about our rights and your responsibilities regarding the online portion of the Program, see the Terms of Use at the Site.

10. Suppliers of goods and services are independent contractors and are neither agents nor employees of FIA Card Services, N.A., Visa U.S.A. Inc., MasterCard International Inc., or any of their affiliates; or any group, organization, or entity endorsing a credit card program issued by FIA Card Services, N.A. FIA Card Services, N.A. neither offers, endorses, nor guarantees any of the goods, services, information, or recommendations provided by third parties to you.

11. Independent third parties manage the Merchandise and Gift Card/Certificate Rewards portions of the Program. An independent third party travel agency, registered to do business in California (Reg. No. 2036509-50); Ohio (Reg. No. 87890286); Washington (6011237430) and other states, as required, manages the Travel portion of the Program. The Cash Rewards portion of the Program is managed by FIA Card Services, N.A. The MyConcierge Rewards portion of the Program is managed by Les Concierges, Inc.

12. You agree to release FIA Card Services, N.A., the independent third parties, Les Concierges, and each of their respective affiliates and subsidiaries from all liability for injury, accident, loss, claim, expense or damages sustained by you, and in the case of a Travel or MyConcierge Reward, anyone traveling with you or without you, in connection with the receipt, ownership, or use of any Reward. The foregoing entities shall not be liable for consequential damages, and the sole extent of

liability, if at all, shall not exceed the actual value of the Reward. We are not responsible for typographical errors and/or omissions in any Program document.

13. You are responsible for determining any tax liability arising from participation in the Program. Consult your tax advisor concerning tax consequences. The Program is subject to government approval and is void where prohibited by law. All aspects of the Program are governed by the laws of the State of Delaware, without any reference to its choice of law provisions.

Travel Rewards

We describe all Travel Rewards both in terms of the number of Points required and a corresponding maximum dollar value ("MDV"). If the dollar cost of an Air Reward exceeds the MDV, you must pay the difference between the cost and the MDV in order to obtain the Reward. You may either charge the difference to your Card and earn Points for the transaction or you may redeem additional Points in increments of 5,000 (equivalent to an MDV of $50) to cover the difference in the cost.

If the Air Reward you wish to obtain conforms to our specified booking terms it is considered a Basic Air reward. If the Reward does not conform to the terms, then it will be considered a FlexAir reward and you will be required to pay a processing fee and make additional payment to cover the cost in excess of the MDV of the Basic Air reward. You may either charge the difference to your Card and earn Points for the transaction or you may redeem Points in increments of 5,000 (equivalent to an MDV of $50), to cover the difference in the cost. Under either circumstance, your Card will be charged a processing fee (currently $40) for each transaction involving a request for a FlexAir reward. See below for details.

Basic Air Rewards

The number of Points and corresponding MDV required for coach class Basic Air Rewards are: within the 48 continental states of the U.S.: 25,000/$400; from the 48 states to Canada, Mexico, Puerto Rico: 35,000/$600; from the 48 states to Alaska, Hawaii, the Bahamas, Bermuda or the Caribbean; 45,000/$600; from the 48 states to Europe: 60,000/$800; and from the 48 states to Central or South America, Asia, Africa, or the South Pacific: 85,000/$1,150. The number of Points and corresponding MDV required for first- or business-class Air Rewards from the 48 states to any location listed above, are: 100,000/$1,500; 135,000/$2,000; 200,000/$3,000; 265,000/$4,000; 335,000/$5,000: References to the 48 states include travel to and from the District of Columbia. MDV includes all taxes and destination fees except the September 11th Security Fee and surcharges, including, but not limited to fuel related surcharges and/or additional security fees deemed necessary by the individual carrier. Round-trip ticketing must be made through the WorldPoints redemption center on the same U.S. carrier, approved by the Airline Reporting Corporation. Unless redeeming Points for first- or business-class travel, the ticket will be coach class and the lowest fare available through the travel provider at the time of booking.

Reservations and ticketing require at least 21 days' advance notice and must include a Saturday night stay. Most international travel: stay at

least 7 but no more than 30 days. Check requirements when booking. Stopovers of more than 4 hours are not permitted and there is no limit on connections. Actual travel dates/times are subject to availability of coach-,business-, or first-class airfare, as applicable. Air Rewards are not refundable (see General Terms, Paragraph 5, above). Miscellaneous costs, including, but not limited to, excess baggage, gratuities, insurance, and airline amenities, are your responsibility.

Flex Air Rewards

If the Air Reward you wish to obtain does not conform to the Basic Air reward terms described above (e.g., less than 21 days advance notice, no Saturday night stay, stopping in multiple cities, selecting a specific airline, an international stay lasting less than 7 or longer than 30 days, or similar special requests), the reward will be considered a FlexAir reward. Point redemption levels for FlexAir rewards are the same as those of the Basic Air rewards, however the MDV is different for each. The number of Points and corresponding MDV required for FlexAir rewards are: Within the 48 continental states of the U.S.: 25,000/$250; to Canada, Mexico, or Puerto Rico: 35,000/$350; to Alaska, Hawaii, the Caribbean, the Bahamas or Bermuda: 45,000/$450; to Europe: 60,000/$600; to Central or South America, Asia, Africa, or the South Pacific: 85,000/$850: each of the respective Points and MDV requirements also apply should the FlexAir itinerary originate from AK, HI, or from any of the international locations and terminate at a destination within the 48 states. References to the 48 states include travel to and from the District of Columbia. If the cost of the FlexAir reward exceeds the MDV, then you may redeem Points in increments of 5,000/$50, to cover the cost of the ticket or pay the difference using your Card. For example, if the cost of the FlexAir reward within the continental U.S. is $340, and you have 35,000 Points available to redeem, you may use 25,000 Points plus one (1) 5,000/$50 credit and charge the remaining $40 to your Card, or you may use 25,000 Points plus two (2) 5,000/$50 credits. In the case of the latter, your account will not receive credit of any kind (e.g., monetary credit or Points) for unused Points. Points are redeemable only in increments of 5,000 and cannot be used to pay the FlexAir reward-processing fee. MDV includes all taxes and destination fees except the September 11th Security Fee, the FlexAir reward processing fee, and any airline-imposed surcharges, including, but not limited to fuel related surcharges and/or additional security fees deemed necessary by the individual carrier.

Car Rental & Hotel Rewards

Rent any size vehicle for any number of days with pickup and return to the same rental location within the U.S., using Points and in some instances, Points in combination with the use of the Card. 5,000 Points = $50 MDV.

Hotel Rewards are available at participating properties in the U.S. Use your Points, and in some instances, Points in combination with the use of the Card to obtain accommodations. 5,000 Points = $50 MDV.

For every 5,000 Points you use to obtain an eligible car rental or hotel reward, you will receive a $50 credit toward the cost of the rental of any available vehicle or towards the cost of the hotel accommodations. Redeem as many $50 credits as you choose toward your car rental or

hotel award arrangements. For example, if the cost of the car rental or hotel reward is $140 and you have 15,000 Points available to redeem, you may use two (2) $50 credits and charge the remaining $40 to your Card, or you may use three (3) $50 credits. In the case of the latter, your account will not receive credit of any kind (e.g., monetary credit or Points) for unused Points. Points are redeemable only in increments of 5,000. Advance reservations of at least 7 days are required and all travel arrangements are subject to availability. Miscellaneous costs are your responsibility. No minimum stay requirement.

You must meet credit, age, and driver requirements in effect at the time and place of car rental or at the time reservation or check-in. We process a credit transaction to your Card within five business days after you make your reservation. The credit will equal the MDV of the Points you have used to obtain the rental, or the actual cost of the Reward, whichever is less. Present your Card upon arrival and when returning the vehicle or upon arrival and when you check out. When you return the vehicle or check out, a debit transaction equal to the dollar value of the complete rental cost or the total dollar value of your room bill will be charged to the Card by the rental agent or the hotel. Costs not covered by the Car Rental Reward (e.g., optional charges, including but not limited to refueling, optional/supplementary liability insurance, personal effects coverage and loss damage waiver, drop-off charges, late-return fee, additional driver fee, and/or excess mileage fees; or you upgrade the vehicle category, personal charges, food and beverages, additional person(s), and other optional and incidental expenses, or you upgrade the room category) will be included in the debit transaction and are your responsibility: you earn Points for additional costs charged to the Card. If you do not use the Reward the credit adjustment remains but Points used to obtain the Reward are not reinstated.

Cruise-Related Rewards

You may redeem Points and save on the cost of cabin accommodations or shipboard expenses. All reservations and payments related to WorldPoints Cruise Rewards must be made through the WorldPoints redemption center. For every 25,000 Points you redeem, you will receive a ($250) discount on the cost of your shipboard cabin accommodations. 25,000 Points =$250 MDV. For every ($100) of shipboard credit you request, you must redeem 10,000 Points. 10,000 Points = $100 MDV.

Discount and shipboard credit rewards may not be available on all cruise lines, check at the time of reservation. Cruise-related Rewards may not be used retroactively or to pay the cost of cruise deposits. The cruise discount will not be effective until you have tendered final payment for the travel arrangements. The appropriate number of Points you wish to redeem will be deducted from your total Points earnings when you authorize the billing of the deposit for the reservation to your Card. The amount of the discount may not exceed the total cost of your cruise arrangements.

Miscellaneous charges, including, but not limited to beverages and meals; port charges; taxis and other ground transportation; items of a personal nature (e.g., laundry, dry cleaning, telephone, telefax, internet fees, photographs, medical services, spa services, etc.); excess baggage charges; gratuities; insurance and any other carrier

amenities are not eligible for direct offset with the use of cruise-related Rewards, unless such charges are included in the cost of the travel arrangements as quoted by the cruise line operator, or, if such charges are to be paid through use of your shipboard credit portfolio.

There are no exchanges or refunds for no-shows or unused portions of travel arrangements obtained with the use of cruise-related Rewards. If you cancel your travel plans and cancellation fees are assessed, those fees shall be payable with your Card. Cruise-related Rewards cannot be used to pay any portion of cancellation fees. Once a deposit has been paid, we reserve the right to charge you a cancellation fee. If the cruise operator cancels the cruise you have booked, then all or part of the Points used in connection with the booking may be reinstated to your Points earnings at your request. Points which have been reinstated under these circumstances will expire in accordance with the terms of the Program.

Special Travel Rewards

From time to time, Cardholders may receive opportunities to use their Points for select travel rewards: these rewards may include, but are not limited to cruise and vacation package arrangements. These offers shall be subject to special terms and conditions, which will be disclosed when the rewards are advertised. Special terms may include the cruise line and/or vacation supplier's cancellation and refund policies. We will determine the specific Point redemption level based on the value of each reward.

Merchandise and Gift Certificate Rewards

Redeem Points for merchandise, gift cards or certificate selections at the site or from the current printed pamphlet. The selection of items and the number of Points needed to obtain them may change at any time. Rewards are shipped prepaid. Subject to authorization, returns or exchanges must occur within 10 days of your receipt of merchandise rewards and we pay shipping when we arrange returns of unsatisfactory, damaged, or defective Rewards.

Rewards are subject to availability. Goods of equal or similar value may be substituted if the item you select is unavailable. Featured goods may not necessarily reflect exact colors or models due to printing variation and/or manufacturers' model or style updates or photo facsimile used for general representation of merchandise. Restrictions may apply to the availability of some Rewards, such as federal, state, or local regulations or minimum age requirements. Purchase protection or extended warranty coverage associated with your Card is not applicable to Rewards. Warranty, service and/or support for goods may be available to you directly from the merchants, not from us or the third parties.

Most stock items ship within 48 business hours from receipt of your order, unless advised otherwise. Rewards are sent to street addresses, no P.O. Boxes. Requests for delivery outside the continental U.S., or expedited delivery, are subject to additional shipping charges, if the service is available. Complete details about shipping, including information about direct shipments from suppliers; large freight items; damaged or incomplete shipments, and details about exchanges and refunds are found at the site and by calling the WorldPoints redemption center.

Gift card or certificate expiration dates vary by independent retailers. A gift card or certificate must be surrendered at the time it is used, and no photocopies or other facsimiles of a gift card or certificate will be honored. Each merchant has the right to place restrictions on the use of its gift cards or certificates. Any additional costs, if applicable, for taxes, gratuities, alcoholic and non-alcoholic beverages are left to the discretion of the merchant. The merchant determines the disposition of unused portion(s) of gift cards or certificates. Gift cards and certificates are not exchangeable, refundable, transferable, or redeemable for cash and cannot be replaced if lost or stolen. Any unused portion will not be returned as cash unless it is the policy of the merchant to do so. Gift cards/certificate rewards are void where prohibited by law. Use of any gift card or certificate is subject to any additional restrictions contained on or with the card or certificate.

Cash Rewards

Redeem Points for a variety of Cash Rewards either at the site or by telephoning us. A Cash Reward shall be issued in the form of a check for a pre-determined U.S. dollar sum. Cash Reward checks are not issued automatically, checks will be issued only upon request of the Cardholder. The check will be made payable to the one (1) individual designated by us as the Primary Cardholder, i.e., the check will not be made payable to either a joint cardholder or an authorized user(s), if any. Each check is mailed to the Primary Cardholder's billing address via first-class U.S. mail within fourteen (14) business days of receipt of the request. Requests for multiple checks are processed and mailed separately. Each check will be valid for ninety (90) days from its date of issue. The expiration date will appear on the check. A check that is not presented for payment before the expiration date will be void and the Cash Reward will then be awarded as a statement credit posting to your Card within two Billing Cycles following the expiration date. If your Card is closed before a check is drawn, or a statement credit appears, then the Cash Reward will be forfeited (except if your Card has been reported as lost or stolen, subject to verification). Receipt of a Cash Reward check or the appearance of a statement credit does not affect your responsibility to pay your Total Minimum Payment shown on each Statement you receive from us (see General Terms, Paragraph 4, above). There is no yearly limit to the number of checks you may receive.

Currently available rewards and their respective Point requirements are:

2,500 Points = $12.50 Cash Reward

5,000 Points = $25 Cash Reward

7,500 Points = $37.50 Cash Reward

10,000 Points = $80 Cash Reward

15,000 Points = $120 Cash Reward

20,000 Points = $160 Cash Reward

25,000 Points = $250 Cash Reward

35,000 Points = $350 Cash Reward

50,000 Points = $500 Cash Reward

MyConcierge Rewards

Redeem Points for goods and services available through the MyConcierge service. Points may be used as full payment to obtain a Reward through the MyConcierge service. Points may not be combined with any other form of payment to purchase goods or services through the MyConcierge service. The dollar value of the Reward obtained with Points must be less than or equal to the value of the Points you use. Rewards may be subject to special terms and conditions that will be disclosed when the goods and/or services are requested. Special terms may include the reward supplier's cancellation and refund policies. We will determine the specific Point redemption level based on the dollar value of each reward.

MyConcierge Personal Concierge Service

WorldPoints Rewards credit card Customers (this includes you, your spouse, and your dependents, under 22 years of age) are provided with access to the MyConcierge personal concierge service, for personal use only. You will be asked to verify your status as a WorldPoints credit card Customer whenever you use the MyConcierge service: you should take proper precautions to keep your verification information confidential. The MyConcierge service will make every reasonable effort to help you with planning an occasion or taking care of personal needs, whether you're at home or on the road. Goods and services obtained through the MyConcierge service may be purchased, or, if you qualify, you may pay in full using WorldPoints points ("Point(s)"). The MyConcierge services are provided by Les Concierges, Inc. ("Les Concierges"). Requests for assistance can be made by telephoning Les Concierges or online by visiting **www.bankofamerica.com** 24 hours a day, 7 days a week. From outside the U.S., call collect to: 415.263.6031. Requests made through any means other than the foregoing may result in additional fees and/or charges. Under no circumstances may Points be used to pay additional fees or charges of any kind.

By using the MyConcierge service, you agree to be bound by the terms and conditions appearing (a) in this document if you access the MyConcierge service by telephone and/or (b) at the MyConcierge web site if you use online access (collectively, the "Terms of Use"). All information provided by you is provided directly to Les Concierges, Inc. Information gathered from you in connection with your use of the MyConcierge service will be subject to the terms of the FIA Card Services, N.A. Privacy Policy accompanying your credit card, and also appearing on the Site. Any waiver of any of the provisions of the Terms of Use and/or the Privacy Policy referred to above must be in writing and signed by an authorized representative of FIA Card Services, N.A.

You may cease use of the MyConcierge service for any reason and at any time; provided, however, that you will be responsible for all charges made at your request prior to such termination. Just as you may choose to stop using the MyConcierge service, we may terminate your access to the MyConcierge service at any time if you violate any of the Terms of Use or if we believe that your WorldPoints account is being used in an unauthorized or fraudulent manner. If we terminate your access to the MyConcierge service, your agreement to the Terms

of Use means you will not hold us responsible for the termination.

The MyConcierge Terms of Use may change. When such changes are made, we will notify you in writing and post revised Terms of Use at the MyConcierge Web site. If you use the MyConcierge online service, it is your responsibility to review the online Terms of Use from time to time to be aware of any change. Your continued use of the MyConcierge service will indicate your agreement to any change. We cannot guarantee that information provided through the MyConcierge service will always be accurate or up-to-date; or that you will have continuous access to the MyConcierge service. The MyConcierge service materials may include technical inaccuracies or typographical errors. We reserve the right to add to, remove, or change any of the content or functions of the MyConcierge service without giving specific notice to you. We have no control over the quality, safety, or legality of any products or services purchased by or for you via the MyConcierge service. We do not have control over the truth or accuracy of any advertisements or promotions of any merchants. You should pursue any problems or grievances you may have directly with the responsible merchants.

FIA CARD SERVICES, N.A. AND LES CONCIERGES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, ACCOUNTANTS, ATTORNEYS, AGENTS, AFFILIATES, SUBSIDIARIES, SUCCESSORS AND ASSIGNS, SHALL NOT BE LIABLE FOR ANY DIRECT, INCIDENTAL, CONSEQUENTIAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES ARISING OUT OF OR CONNECTED WITH (I) YOUR USE OF MYCONCIERGE OR (II) ANY OTHER SUBJECT MATTER OF THIS AGREEMENT. Some states do not allow the disclaimer of warranties or the exclusion of liability for consequential damages, so the above limitations may not apply to you in all cases.

You agree to defend, indemnify, and hold harmless FIA Card Services, N.A. and Les Concierges, their respective licensees, successors, and assignees, affiliated merchants, content providers, technology and service providers, advertisers and sponsors, the parent, affiliated and subsidiary companies of each of them and the officers, directors, employees, and agents of each of them from and against any and all third party claims, damages, liabilities, costs and expenses, including reasonable legal fees and expenses, arising out of or related to any breach by you of the Terms of Use or any use of the MyConcierge service by you or by anyone using your WorldPoints credit card account.

If you make a purchase using the MyConcierge service without redeeming Points, it is your responsibility to make full and timely payment. FIA Card Services, N.A. and/or Les Concierges, Inc. shall not be responsible for any consequences due to your failure to remit payment. If there should be an error in the information provided by the MyConcierge service to the merchant it is still your responsibility to pay for the purchase, unless the purchase was made solely with the use of Points.

You agree that in order to process your transactions, the information you provide will be disclosed to merchants and other parties involved in your transaction. Examples of such information include your shipping address, credit card number and billing information. You acknowledge that FIA Card Services, N.A. and Les Concierges have no control over, and no responsibility or liability for, the use by any merchants of

personal information or any other information that such merchants independently acquire from you, or that is given to such merchants to process your transactions. The Terms of Use will be construed and interpreted in accordance with the laws of the State of Delaware, without reference to its conflict-of-laws rules. You will comply with all applicable laws, statutes, ordinances, and regulations, either within or outside the United States, which may apply to your use of the MyConcierge service and your purchase and use of goods and services. You acknowledge that various goods or services offered from merchants may be prohibited in your geographic area. These Terms of Use are in addition to the terms of your WorldPoints Credit Card Agreement, including its provisions regarding the use of arbitration to resolve Claims (as defined in the Credit Card Agreement).

Bank of America is a registered trademark of Bank of America Corporation. MyConcierge$^{SM}$ is a service mark of Les Concierges, Inc. All other company, product, and service names may be trademarks or service marks of others and their use does not imply endorsement or an association with this program.

© 2007 Bank of America Corporation.

Privacy & Security · Terms of Use

Bank of America, N.A. Member FDIC. Equal Housing Lender
©2007 Bank of America Corporation. All rights reserved.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 3



## Welcome

You have reached this website because you have questions related to charges that have shown up on your credit card statement listed as Trip Charges.

Our company provides online and call center travel fulfillment for:

- Loyalty redemption programs for:
  - Credit cards
  - Debit cards
- Leisure travel for affinity groups
- Leisure travel for employee groups

The charges may be reflective of:

- Award overages
- Service fees
- Security fees
- Fuel surcharges
- Overnight delivery charges
- Travel insurance
- Theme park and attraction passes
- Deposits for cruises or tours

If you still have additional questions regarding the nature of your charges, please contact us at 208-429-2349.

Trip Charges

© 2007 Carlson Travel Group, Inc. and Subsidiaries

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 4

 

## Sellers of Travel Results Last Updated 11/30/2007

There are **1** Matching Records
Page: **1 of 1**
Displaying matches **1** through **1**

| Registration # | Name | Contact | Phone | TCRC Fund[(1)] | Registration Expiration Date | Location | DBA |
|---|---|---|---|---|---|---|---|
| 2036509 | Carlson Travel Group, Inc. | Phyllis Barrett | (763) 212-2920 | No | 3/31/2008 | Locations | DBAs |

[1]Only sellers of travel with a principal office in California or who trade on a public exchange are allowed/required to be participants in TCRC. Auto clubs are required to register but they are not required to participate in TCRC. There also may be a small number of sellers of travel who have declared they make no sales at any time in California and do not need to be TCRC participants.

**Search Again**
Return to Sellers page



AG HOME | SELLERS OF TRAVEL

1
2
3
4
5
6
7
8
9
10
11
12
13    Exhibit 5
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

### KAMBEREDELSON, LLC Firm Resume

2

**SCOTT A. KAMBER** is a founding member of KamberEdelson and managing member of its New York office. Mr. Kamber specializes in technology-related litigation and representing

3

individuals and businesses domestically, as well as in complex international matters. Mr. Kamber has an extremely diverse practice before federal and state courts throughout the

4

United States and arbitration panels abroad, with clients ranging from individuals to multinational corporations to classes of consumers and investors. Mr. Kamber and his firm

5

regularly serve in leadership roles in numerous litigations including suits on behalf of shareholders, consumers and private corporations in the United States and abroad.

6

Experienced in law and business, Mr. Kamber has a proven track record of addressing a client's needs in an individualized manner.

7

8

Mr. Kamber has served as class counsel in dozens of class actions in state and federal courts throughout the United States. Presently, Mr. Kamber is litigating nationally prominent class actions such as *In re Menu Foods* (D.NJ.); *Johnson et al. v. Microsoft* (W.D.WA); *Elvey et al.*

9

*v. Ameritrade* (N.D. Cal.); *In re Network Commerce Securities Litigation* (W.D. Wa); *In re ATI HDCP Litigation* (N.D. Cal.); *In re Power Plug Litigation (Hewlett Packard)* (N.D. Cal.);

10

and *In re GM Onstar Litigation* (E.D. Mi.). Mr. Kamber has served as lead counsel and in other leadership roles for numerous class actions that have achieved significant results,

11

including *In re Sony BMG CD Technologies* (ground-breaking settlement providing injunctive relief and refunds to customers who purchased music CD's which could compromise

12

computer security): *Wormley v. GeoCities* (consumer class action for privacy violations that is believed to be the first internet privacy case to recover a benefit for impacted class members);

13

*In re Starlink Growers* (represented sub-class of farmers who grew Starlink in a consolidated settlement of federal class action valued in excess of $100 million); *In re Loch Harris*

14

(derivative action that successfully obtained dissolution of corporation and distribution of assets to shareholders); *In re Command Systems* (securities class action in which participating

15

shareholders recovered over 80% of their losses); and *In re WebTV* (consumer class action for false advertising). In addition to these commercial litigations, Mr. Kamber has been involved

16

in the efforts of African torture victims to bring their persecutors to justice under the Alien Tort Claims Act and has achieved significant decisions for his clients before the United States

17

Court of Appeals for the Second Circuit and the Southern District of New York. One such result, *Cabiri v. Ghana*, 165 F.3d 193 (1999), is a leading Second Circuit case under the

18

Foreign Sovereign Immunities Act.

19

Mr. Kamber graduated *cum laude* from University of California, Hastings College of the Law in 1991 where he was Order of the Coif, Articles Editor for Hastings Constitutional Law

20

Quarterly and a member of the Moot Court Board. Mr. Kamber graduated with University and Departmental Honors from The Johns Hopkins University in 1986. Mr. Kamber has

21

extensive courtroom experience and has tried over 15 cases to verdict. Prior to founding Kamber & Associates, LLC, Mr. Kamber represented both plaintiffs and defendants in a wide

22

range of commercial litigation. Mr. Kamber is admitted to practice in the State of New York as well as the United States Supreme Court, the United States Court of Appeals for the Second

23

Circuit and Eighth Circuit, and the United States District Courts for the Southern and Eastern Districts of New York. In addition, Mr. Kamber is well-versed in the procedures and practice

24

of numerous arbitration forums, both domestic and international. Prior to practicing law, Mr. Kamber was a financial consultant.

25

26

**JAY EDELSON** is a founding member of KamberEdelson. He has served as lead counsel in over 40 class actions, resulting in hundreds of millions of dollars in relief for his clients. His class action cases have established precedent concerning the ownership rights of domain name

27

registrants, the applicability of consumer protection statutes to internet businesses, and the interpretation of numerous life insurance, health insurance, and other state statutes. In

28

February of 2007, the Chicago Sun Times nicknamed Mr. Edelson the "Spam Slammer" after he secured the first settlement of a suit under the Telephone Consumer Protection Act for the

1   alleged transmission of unsolicited text messages.

2   Mr. Edelson has been involved in a number of high-profile "mass tort" class and mass actions,
    including ones against Menu Foods for selling contaminated pet food, Merck for its sale of the
3   prescription pain drug, Vioxx, and suits involving damages arising from second hand smoke.

4   Mr. Edelson is frequently asked to participate in legal seminars and discussions regarding the
    cases he is prosecuting.  He has also appeared on dozens of television and radio programs to
5   discuss his cases.  In April of 2007, Mr. Edelson provided testimony to the Subcommittee on
    Agriculture Appropriations, Senate Committee on Appropriations, U.S. Senate Hearing on
6   "Pet Food Contamination" in connection with one of the class action cases he is prosecuting.
    Mr. Edelson consults with the University of Chicago Medical Center and the Pritzker School
7   of Medicine of internet and legal ethics issues.

8   Mr. Edelson is a 1994 graduate of Brandeis University and a 1996 graduate of the University
    of Michigan Law School.

9

10  **ALAN HIMELFARB** is a member of KamberEdelson.  Mr. Himmelfarb was admitted to the
    practice of law in California in July, 1979.  At that time, at the age of 23, he was the youngest
11  member of the California Bar.  Within five years, he became managing attorney of a law firm
    employing six attorneys and a support staff of ten.  He specialized in complex litigation,
12  contracts, high technology, foreign licensing, and foreign technology transfers, and practiced
    before both state and federal courts.  In 1988, he took a position overseas as a foreign legal
13  consultant in Asia.  In this capacity, he acted as chief negotiator for international
    sales/service/technical transfer agreements, mediated cross-cultural (Asian--Western) business
14  and governmental interests, evaluated international business/marketing strategies for
    multinational corporations, drafted and negotiated a full range of international transactional
15  agreements for Korean, European and American corporations and businessmen and marketed
    legal services to Korean domestic market and international community.  In 1992, Mr.
16  Himmelfarb returned to Los Angeles in the capacity of a litigator, with an emphasis on
    plaintiff's work against banks and other financial institutions.  He has been engaged in class
17  action litigation since 1994.

18  **ETHAN PRESTON** is a member of KamberEdelson.  Mr. Preston focuses on consumer
    technology, and concentrates his practice in antitrust/competition issues and information
19  security issues.  Mr. Preston has taken substantial leadership roles in numerous class action
    lawsuits.

20  Mr. Preston is admitted to practice before the Northern District of Illinois, the District of New
    Mexico, and Illinois state courts. Mr. Preston is an inactive member of the New Mexico state
21  bar.  Mr. Preston has authored the following law review articles: *Cross-Border Collaboration
    by Class Counsel in the U.S. and Ontario*, 4 Canadian Class Action Rev. 164 (2007), *The
22  Global Rise of a Duty to Disclose Information Security Breaches*, 22 J. Marshall J. Computer
    & Info. L. 457 (2004) (with Paul Turner), *Computer Security Publications: Information
23  Economics, Shifting Liability and the First Amendment*, 24 Whittier L. Rev. 71 (2002) (with
    John Lofton), and *The USA PATRIOT Act: New Adventures in American Extraterritoriality*,
24  10 J. Fin. Crime 104 (2002).  Mr. Preston has lectured on copyright issues at the University of
    Illinois at Chicago, and on comparative law on attorneys' fees and costs for the Center for
25  International Legal Studies.

26  Mr. Preston received his Bachelor of Arts degree with honors from the Plan II honors program
    at the University of Texas at Austin, and his J.D. with distinction from the Georgetown
27  University Law Center in 2001.

28  **MYLES MCGUIRE** is an associate at KamberEdelson.  His practice concentrates, nearly
    exclusively, on consumer protection law and class actions.  Mr. McGuire currently represents

1   classes in matters involving electronic commerce, cellular telephony and wireless media,
2   among others.

3   Mr, McGuire graduated from Marquette University Law School in 2000 and is admitted to
    practice in Wisconsin and Illinois.  He is a member of the National Association of Consumer
    Advocates and the Chicago Bar Association.  Prior to working as a plaintiff's attorney, Mr.
4   McGuire spent several years counseling high-tech companies.

5   **DANA B. RUBIN** is an associate at KamberEdelson focusing her practice on a wide range of
    class action issues.  She graduated with honors from the University of Maryland, College Park
6   in 1993. She received her J.D. in 1999 from Fordham University School of Law, where she
    was an Associate Editor on the Intellectual Property, Media & Entertainment Law Journal.
7

8   Prior to joining KamberEdelson, Ms. Rubin played a role in numerous private and class
    actions on behalf of shareholders and consumers.  Ms. Rubin has also represented both
    plaintiffs and defendants in employment litigation and civil rights matters.  Ms. Rubin is
9   admitted in the State Courts of New York and the United States District Courts for the
    Southern and Eastern Districts of New York. She is a member of the New York State Bar
10  Association.

11  **STUART D. WECHSLER** is Of Counsel to KamberEdelson.  The efforts of Mr. Wechsler in
    the area of securities litigation have received considerable judicial comment. U.S. District
12  Court Judge Alvin K. Hellerstein commented in *Doney v. Command Systems*, (98 Civ. 3279),
    in an opinion dated August 10, 1999, "I don't think it needs my comment to note that, Mr.
13  Wechsler, you are a senior and most respected and most competent member of the securities
    class action bar. I would take it as a given your hours are worth the rates that you charge and
14  that the hours that you have put in reflect the efficiency with which you work."  In a report
    dated May 23, 1977, in *Bucher v. Shumway*, 76 Civ. 2420 (S.D.N.Y.), United States
15  Magistrate Leonard Bernikow stated that "Stuart Wechsler . . . is a leading expert in securities
    class action litigation."  Mr. Wechsler also led the team of attorneys that successfully
16  prosecuted the class action, *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322 (1979), to a
    landmark decision in federal civil procedure.  He was also the responsible partner in *Van
17  Gemert v. Boeing*, one of the earliest actions maintained as a class action under the then newly
    amended Federal Rules of Civil Procedure and one of the very few securities class actions
18  ever to go to trial and judgment.  Moreover, Mr. Wechsler played an integral role in obtaining
    a landmark Supreme Court decision in an important phase of that action.  *See Van Gemert v.
19  Boeing*, 444 U.S. 472 (1980).

20  Mr. Wechsler was admitted to the bar 1958, New York; Supreme Court; U.S. Court of
    Appeals, Second, Third and Fifth Circuits; U.S. District Court, District of Arizona; U.S.
21  District Court, Western District of Michigan. Education: University of Pennsylvania (B.S.,
    1953); Yale University (J.D., 1955). Editor: "Prosecuting and Defending Stockholder Suits,"
22  Practicing Law Institute, Nov., 1973. Author: "The Securities Acts Amendments of 1964,"
    Stock Market Magazine, November, 1964; "Notice to Debenture Holders," The Review of
23  Securities Regulation, April 15, 1976. Chairman: PLI Programs regarding class actions and
    stockholder suits, 1970-1977, "New Trends in Securities Litigation," 1977-79 and
24  "Exemptions from Registration: Spinoffs-Shells and other Devices," 1970. Faculty Member,
    Columbia Law School Continuing Education Programs, 1979-1982. Chairman: Practicing
25  Law Institute program, "Stockholder Suits and Class Actions," 1986; University of Virginia
    seminar, "Trial of a Securities Case," 1989. Lecturer, Panels on Securities Litigation and
26  Class Actions, American Bar Association, 1975; ALI-ABA Study Course, Civil Rico
    Member, Board of Directors, Concert Artists Guild, 1982-1984. Member, Board of Editors,
27  "Class Action Reports," 1977. Chairman, Securities Law Committee, Federal Bar Council,
    1980-1985. Member, Committee on Second Circuit Courts of the Federal Bar Council, 1986.
28  Member: American Bar Association; Federal Bar Council.

**JOHN BLIM** is Of Counsel to KamberEdelson.  Mr. Blim is a graduate of Northwestern University School of Law, where he received his J.D. degree *cum laude* in 1994 and was elected to the Order of the Coif.  He served as an associate articles editor on the Northwestern University Law Review from 1993 to 1994. Mr. Blim was also a member of the winning team and voted Best Speaker in the law school's moot court competition.  From 1994 to 2000, he was a litigation associate at nationally recognized law firms, including Sidley & Austin.

Mr. Blim has published articles in major legal journals, and his writing has been described as "thoughtful commentary" by a leading treatise on constitutional law.  Before attending law school, John earned his Ph.D. in English literature from Northwestern University, where he was also a lecturer in the school's English department.  State and federal courts have appointed Mr. Blim as class counsel in numerous class action cases collectively benefiting millions of individuals.